Michael S. MICKEVICH, Plaintiff,

v.

Jo Ann [sic] BARNHART,
Commissioner of Social
Security, Defendant.

Civil Action No. 2005–11649–RBC.

United States District Court,
D. Massachusetts.

Sept. 28, 2006.

Michael J. Kelley, Law Office of Michael J. Kelley, Boston, MA, for Plaintiff.

Rayford A. Farquhar, United States Attorney's Office, Boston, MA, for Defendant.

### MEMORANDUM AND ORDER ON MOTION TO REVERSE OR REMAND THE DECISION OF THE COMMISSIONER OF SOCIAL SECURITY (# 9) AND DEFENDANT'S MOTION FOR ORDER AFFIRMING THE DECISION OF THE COMMISSIONER (# 13)

COLLINGS, United States Magistrate Judge.

#### I. Introduction

On August 9, 2005, plaintiff Michael S. Mickevich (hereinafter "Mickevich") filed a

complaint (# 1) against Jo Anne Barnhart, Commissioner of the Social Security Administration (hereinafter "the Commissioner"), seeking judicial review of the Commissioner's final decision denying his application for Social Security benefits. The Commissioner's answer (# 2) and the transcript (administrative record) (# 7) were filed on October 7, 2005.

Five months later on March 20, 2006, Mickevich filed a Motion To Reverse Or Remand The Decision Of The Commissioner Of Social Security (# 9) together with a memorandum of law (# 10). On May 9, 2006, the defendant filed a Motion For Order Affirming The Decision Of The Commissioner (# 13) as well as a memorandum in support (# 14). That same day this case was reassigned to a Magistrate Judge for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c). (# 15) On May 11, 2006, two days after the reassignment, that Magistrate Judge entered an Order of Recusal. (# 16)

On July 28, 2006, this case was reassigned to the undersigned pursuant to 28 U.S.C. § 636(c). (# 17) At this juncture the record on the parties' cross-motions is complete and the case is ready to be decided.

## II. Procedural Background

On May 27, 2003, Mickevich filed an application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("SSDI") in which disability status was claimed as of March 15, 2000. (TR[1] at 202–205) Approximately two months later on July 25, 2003, the applica-

tion was disapproved. (TR at 27–30) The plaintiff then submitted a Request for Reconsideration (TR at 31) which was denied on November 14, 2003. (TR at 32–34).

Mickevich filed a request for a hearing before an Administrative Law Judge ("ALJ") on December 16, 2003. (TR at 35) That hearing was scheduled for, and took place on, December 13, 2004. (TR at 36–39; 211–251) The plaintiff attended the hearing with his father, but he was not then represented by counsel.[2] (TR at 213) An unfavorable decision was issued by the ALJ on March 24, 2005. (TR at 13–24)

On May 25, 2005, the plaintiff filed a request for a review of the hearing decision (TR at 10); that request was denied by the Appeals Council on July 21, 2005. (TR at 7–9) Consequent to this denial, the ALJ's decision became the final decision of the Commissioner. Mickevich filed the instant action pursuant to 42 U.S.C. § 405(g) to have that final decision reviewed.

## III. The Facts

Mickevich turned thirty-four years old on the day of the administrative hearing, having been born on December 13, 1970. (TR at 217) He graduated from high school, but has no further formal training. (TR at 217) From April of 1994 through December of 1995 he was employed as a cashier/food server, and then for three months, June through August, 1996, he worked as a pallet repairer.[3] (TR at 48, 58) Mickevich's most significant work history is when he was employed from October, 1996 until April, 1998 as a dishwasher and prep cook. (TR at 48, 58) From November, 1999, until March, 2000, he

---

1. The transcript or administrative record shall be referenced throughout by the shorthand "TR".

2. Current counsel was not retained until May of 2005, after the ALJ's unfavorable decision had been rendered. (TR at 11–12)

3. For one week in 1996 Mickevich worked as a custodian in a nursing home. (TR at 48, 58)

worked as a dishwasher/prep cook at two different restaurants and a nursing facility. (TR at 48, 58)

In 1987 when he was sixteen years old the plaintiff was in a motorcycle accident as a result of which he suffered a lumbar spine fracture, a duodenal perforation, a splenic laceration and a common bile duct perforation. (TR at 114) Mickevich underwent surgery for his injuries, including a total duodenectomy and gall bladder removal as well as "a posterior spinal fusion of T12 to L4 with Harrington compression instrumentation [compression rod of fusion] and left iliac crest bone grafting." (TR at 114–116, 119–122) He thereafter developed post-traumatic hypertension. (TR at 114–116)

In September of 1988, thoracic-lumbar spine x-rays revealed "Harrington rods in place with normal alignment." (TR at 102) The medical notes at the same time indicate that the plaintiff was neurologically intact and that he had been biking and swimming with good mobility. (TR at 101) The plan was for Mickevich to resume his normal activity with no vigorous sports and no lifting more than forty pounds. (TR at 101)

In 1989 and 1990, the status of the plaintiff's spine remained unchanged. (TR at 99–100) Medical notes in April, 1990 reflect that Mickevich had a well healed scar, good fusion, and good flexion as he was able to touch his toes. (TR at 98) In May of 1990, Mickevich was a front seat passenger when the car in which he was traveling was involved in an accident. (TR at 94) He complained of knee pain following the accident. (TR at 94)

In mid-August, 1990, the plaintiff was seen at the emergency room at Jordan hospital for evaluation "of descriptive verbalization of suicidal ideation, intent and depression." (TR at 84, 86, 88) He told an IVP technician that his motorcycle acci-

dent in 1987 was really an attempted suicide and that he thought about killing himself every day. (TR at 86) Mickevich was transferred to Cape Cod Hospital Psychiatric Center via ambulance in restraints. (TR at 84, 86,88)

A lumbosacral spine series taken in April, 1991, showed that "there has been no change in alignment and no evidence of bone destruction." (TR at 97) Mickevich did report lower back pain with no radiation to his legs, but he took no medications at that time. (TR at 96)

In May, 2003, the plaintiff completed the Social Security Disability Report. With respect to his medical records, he indicated that he had last seen a physician in 1991/1992 and, with regard to medication, that he was taking advil and tylenol for pain/discomfort. (TR at 59–62) Mickevich described the illnesses, injuries or conditions that limit his ability to work as "complications from duodenal perforation" and "limited mobility due to August 31, 1987 accident." (TR at 57) More specifically, he notes that he "suffered a duodenal perforation, splenic laceration, bile duct perforation, lumbar spine fractures, and post-traumatic hypertension." (TR at 64) The plaintiff stated that he underwent surgery for the various injuries, incurred "bicep damage to right arm" and "developed high blood pressure and kidney-stones." (TR at 64) In addition, his food intake must be monitored in order "to avoid dumping syndrome; acid reflux; stomache (sic) cramps." (TR at 64) As a result of these injuries Mickevich asserted that he could not sit or stand for long periods of time and was limited with respect to walking, bending or lifting anything more than 20–25 pounds. (TR at 64)

According to a Consultative Examination Report dated June 27, 2003, Mickevich then contended that "[o]ver time his back

has been getting slowly worse" and that "his ability to stand for long periods of time, to walk, to bend, stoop, or carry anything is severely impaired." (TR at 170–171) The examining physician, Dr. Donald J. Greeley, Jr., observed that the plaintiff "seems somewhat nervous and anxious." (TR at 171) On physical examination, Dr. Greeley noted that Mickevich had a "well-healed surgical scar over the thoracolumbar spine", that he could not bend or flex his back completely, that he had full 90 degrees flexion on both sides, that his cranial nerves were grossly intact, his muscles equal and symmetrical except for the right biceps tendon rupture and no radiculopathy. (TR at 172) An x-ray showed satisfactory alignment from the posterior fusion and "very mild degenerative disc disease" and "very mild facet joint arthritis." (TR at 174)

In a July, 2003 Physical Residual Functional Capacity Assessment completed by Dr. M. Connelly, it was determined that the plaintiff could occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds; could stand/walk/sit for 6 hours in an 8 hour day; and that he could occasionally climb, balance, stoop, kneel, crouch and crawl. (TR at 176–182) A second Physical Residual Functional Capacity Assessment completed on November 10, 2003, reflected comparable findings. (TR at 185–191)

On November 18, 2003, Mickevich was examined as a new patient by Dr. Donahue who found tenderness over the entire thoracic spine and so referred the plaintiff to a pain clinic. (TR at 195–196)

In January, 2004, Dr. Jose Puig saw the plaintiff "in pain consultation" consequent to increasing chronic low back pain. (TR at 197 [4]) Mickevich advised the doctor that the pain was "sharp, constant, excruciating" and that he could not stay in the same position for lengthy periods of time. (TR at 197) Dr. Puig noted "increased sensitivity on palpation of the [lumbar] scar" and "decreased range of motion in all directions with increased pain as well." (TR at 198) A CT scan revealed "no acute spinal findings." (TR at 199–200)

At the administrative hearing, Mickevich testified that he was unable to perform his old jobs (or any other jobs) because his back condition was worsening. (TR at 226–227) Reviewing his medical problems, plaintiff described kidney stones (TR at 227), hernias (TR at 228), stomach problems (TR at 228), and sensitivity in the scar at the left hip (TR at 229). Mickevich related that he feels sharp pain when he bends, when he tries to lift things, and when he sits, stands or walks for long periods of time. (TR at 231–233) He also testified that he had difficulty sleeping because of the pain. (TR at 231–233)

The vocational expert testified at the administrative hearing that in light of his limitations, Mickevich could not perform his past work (TR at 244–245), but that he could perform sedentary, unskilled jobs that exist in substantial numbers in Massachusetts and nationally. (TR at 246–247)

## IV. The Standard of Review

Title 42 U.S.C. § 405(g) provides, in relevant part:

Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow ... The court shall have power to enter, upon the pleadings and transcript of the rec-

---

**4.** The report states that there was no patient history of depression. (TR at 197)

ord, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .

The Court's role in reviewing a decision of the Commissioner under this statute is circumscribed:

We must uphold a denial of social security disability benefits unless "the Secretary has committed a legal or factual error in evaluating a particular claim." *Sullivan v. Hudson,* 490 U.S. 877, 885, 109 S.Ct. 2248, 2254, 104 L.Ed.2d 941 (1989). The Secretary's findings of fact are conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g); *see also Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).

*Manso–Pizarro v. Secretary of Health and Human Services,* 76 F.3d 15, 16 (1 Cir., 1996); *see also Reyes Robles v. Finch,* 409 F.2d 84, 86 (1 Cir., 1969) ("And as to the scope of court review, 'substantial evidence' is a stringent limitation.")

The Supreme Court has defined "substantial evidence" to mean " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) quoting *Consolidated Edison Co. of N.Y. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126(1938); *Ortiz v. Secretary of Health and Human Services,* 955 F.2d 765, 769 (1 Cir., 1991). It has been explained that:

In reviewing the record for substantial evidence, we are to keep in mind that "issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Secretary." The Secretary may (and, under his regulations, must) take medical evidence. But the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for him, not for the doctors or for the courts. We must uphold the Secretary's findings in this case if a reasonable mind, reviewing the record as a whole, could accept it as adequate to support his conclusion.

*Lizotte v. Secretary of Health and Human Services,* 654 F.2d 127, 128 (1 Cir., 1981) quoting *Rodriguez v. Secretary of Health and Human Services,* 647 F.2d 218, 222 (1 Cir., 1981); *Geoffroy v. Secretary of Health and Human Services,* 663 F.2d 315, 319 (1 Cir., 1981) ("In any event, whatever label the parties or the court ascribe to the procedure used to review the Secretary's decision, statute and long established case law make clear that the court's function is a narrow one limited to determining whether there is substantial evidence to support the Secretary's findings and whether the decision conformed to statutory requirements." (citations omitted)).

 In other words, if supported by substantial evidence, the Commissioner's decision must be upheld even if the evidence could also arguably admit to a different interpretation and result. *Ward v. Commissioner of Social Security,* 211 F.3d 652, 655 (1 Cir., 2000); *see also Nguyen v. Chater,* 172 F.3d 31, 35 (1 Cir., 1999). Lastly,

Even in the presence of substantial evidence, however, the Court may review conclusions of law, *Slessinger v. Secretary of Health & Human Servs.,* 835 F.2d 937, 939 (1st Cir.1987) (per curiam) (citing *Thompson v. Harris,* 504 F.Supp. 653, 654 [D. Mass.1980] ), and invalidate findings of fact that are "derived by

ignoring evidence, misapplying the law, or judging matters entrusted to experts," *Nguyen v. Chater,* 172 F.3d 31, 35 (1st Cir.1999) (per curiam).

*Musto v. Halter,* 135 F.Supp.2d 220, 225 (D.Mass., 2001).

### V. The Legal Framework

■ The burden is on the plaintiff to prove that he is under a disability in order to establish his right to disability insurance benefits. *Bowen v. Yuckert,* 482 U.S. 137, 146, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). As defined in the Social Security Act, disability means the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months ...

Title 42 U.S.C. §§ 416(i)(1) and 423(d)(1)(A).

The relevant statute further provides that:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in

the region where such individual lives or in several regions of the country.

Title 42 U.S.C. § 423(d)(2)(A).

■ Thus as the statute makes plain, a mental or physical impairment alone is not enough. To be entitled to benefits, a claimant also must be unable to engage in substantial gainful work as a result of that impairment. *See, e.g., McDonald v. Secretary of Health and Human Services,* 795 F.2d 1118, 1119–20 (1 Cir., 1986); *Goodermote v. Secretary of Health and Human Services,* 690 F.2d 5, 6 (1 Cir., 1982) ("Thus, 'disability' under this statute has a 'medical' part, concerning the nature and severity of a claimant's impairment, and a 'vocational' part, concerning the availability of suitable work."); *Thomas v. Secretary of Health and Human Services,* 659 F.2d 8, 9 (1 Cir., 1981).

■ In deciding whether a claimant is disabled within the meaning of the Social Security Act, the Commissioner of Social Security employs a five-step evaluation process as established by the SSA regulations. *See* 20 C.F.R. § 404.1520; *Seavey v. Barnhart,* 276 F.3d 1, 5 (1 Cir., 2001); *Mills v. Apfel,* 244 F.3d 1, 2 (1 Cir., 2001), *cert. denied,* 534 U.S. 1085, 122 S.Ct. 822, 151 L.Ed.2d 704 (2002); *Goodermote,* 690 F.2d at 6–7. The applicable regulation provides as follows:

> § 404.1520
>
> * * * * * *
>
> (4) The five-step sequential evaluation process. The sequential evaluation process is a series of five "steps" that we follow in a set order. If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step. If we cannot find that you are disabled or not disabled at a step, we go on to the next step. Before we go from step three to step four, we assess your

residual functional capacity. (*See* paragraph (e) of this section.) We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps. These are the five steps we follow:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. (See paragraph (b) of this section.)

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (See paragraph (c) of this section.)

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. (See paragraph (d) of this section.)

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. (See paragraph (f) of this section and § 404.1560(b).)

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. (See paragraph (g) of this section and § 404.1560(c).)

20 C.F.R. § 404.1520.

However, as noted by the First Circuit, because the determination of whether the applicant is disabled can be reached at any step along the process, all five steps do not necessarily apply to every applicant. *Seavey*, 276 F.3d at 5.

### VI. Discussion

In the instant case the ALJ reviewed the evidence and followed the requisite steps in evaluating the plaintiff's alleged disability. Specifically the ALJ found that: Mickevich met the insured status requirements; he had not engaged in any substantial gainful activity since March 15, 2000, the alleged onset date of disability; his kidney stones, hernia and scar sensitivity were not medically determinable impairments creating severe limitations; his degenerative disc disease of the lumbar spine is and was a severe impairment, but did not meet or equal a listed impairment in Appendix 1; his subjective allegations of pain and disability were not credible; he could stand/walk for two hours in an eight hour day, sit for six hours in an eight hour day, lift/carry twenty pounds occasionally and ten pounds frequently, was restricted to occasional stooping and could perform a broad range of sedentary work; he could not return to his past relevant work; he was a younger individual; he has a high school education; he has a skilled and unskilled work history; the rules directed a finding of not disabled based on his vocational profile; his restrictions for occasional stooping did not greatly impact the sedentary occupational base so that a finding of not disabled is indicated; and the plaintiff "has not been under a disability for the period beginning March 15, 2000, or at any time through the date of this decision." (TR at 22)

Mickevich does not take issue with the ALJ's findings or decision *per se*. Rather, he advances a single argument in support of his motion to remand or reverse, to wit, that the ALJ, while under an increased obligation to protect a unrepresented claimant, failed properly to develop the record. In particular the plaintiff contends that the ALJ did not discuss the record evidence related to his mental health or make any inquiry into mental or emotional issues.

█ There is no dispute that

[a] lthough the burden is initially on the claimant to prove he is unable to perform his previous work, when a claimant is unrepresented, the ALJ has a heightened duty to develop the record. *Heggarty v. Sullivan*, 947 F.2d 990, 997 (1st Cir.1991); *see also Carrillo Marin v. Secretary of Health and Human Servs.*, 758 F.2d 14, 17 (1st Cir. 1985); *Currier v. Secretary of Health, Educ. and Welfare*, 612 F.2d 594, 598 (1st Cir.1980). The ALJ must develop the record with specific information and without evidentiary omissions. Upon reviewing that record, the court must determine "whether the [alleged] incomplete record reveals evidentiary gaps which result in prejudice to the plaintiff." *Gauthney v. Shalala*, 890 F.Supp. 401, 410 (E.D.Pa.1995). If the ALJ fails to fill those evidentiary gaps, and if they prejudice plaintiff's claim, remand is appropriate. (*Id.*).

*Mandziej v. Chater*, 944 F.Supp. 121, 130 (D.N.H., 1996).

Indeed, in the words of the Second Circuit, when a claimant is unrepresented, "the administrative law judge has a duty 'scrupulously and conscientiously (to) probe into, inquire of, and explore for all the relevant facts.' " *Cutler v. Weinberger*, 516 F.2d 1282, 1286 (2 Cir., 1975) quoting *Gold v. Secretary of Health, Education & Welfare*, 463 F.2d 38, 43 (2 Cir., 1972).

The questions, therefore, are two. First, did the ALJ perform this duty? And, second, if he did not, did his failure prejudice the claimant?

The Commissioner points out that Mickevich did not list depression as an illness, injury or condition that limits his ability to work in his application for Social Security benefits. (TR at 57) While that certainly is true, nonetheless the July 23, 2003 Notice of Disapproved Claims states that "[y]ou [Mickevich] said that you are disabled because of back pain and injury, anxiety and depression." (TR at 27) Although there is nothing in his application to indicate that "anxiety" or "depression" were part of the basis of the claim, either the Social Security Administration had been informed in some manner that the plaintiff was claiming disability consequent to anxiety and depression, among other things, or the entry respecting "Anxiety" and "Depression" was an error.

That Mickevich denied a history of depression in January, 2004 (TR at 197) is not dispositive, and, in fact, is belied by the August, 1990 medical records from Jordan Hospital. (TR at 84, 86, 88) Moreover, in June of 2003, the consulting physician found Mickevich to be "somewhat nervous and anxious" upon examination. (TR at 171) These references in the administrative record should have prompted the ALJ to delve deeper.

█ There is enough evidence in the record to suggest that Mickevich may have a potential mental health issue such that the ALJ was under an obligation to probe further. At a minimum, the ALJ should have inquired of the claimant as to whether his mental conditions formed any basis of his claim for disability.

He also might have sought additional medical records, for example, from the Cape Cod Hospital Psychiatric Center where Mickevich was transported in restraints in light of his "descriptive verbalization of suicidal ideation, intent and depression", in order to develop the record fully and fairly. *See, e.g., Binion v. Shalala,* 13 F.3d 243, 245–246 (7 Cir., 1994). In sum, the ALJ failed to meet his "heightened duty" to "probe into, inquire of and explore for all of the relevant facts." *Vaile v. Chater,* 916 F.Supp. 821, 829 (N.D.Ill., 1996) (internal citations omitted). Or put another way, he was not sufficiently "scrupulous" in delving into the facts which appeared in the record.

█ That being said, the Court is hard-pressed to see how the failure prejudiced the claimant. *Mandziej,* 944 F.Supp. at 130. Even had the ALJ made the required inquiry, there is nothing to indicate that the claimant's mental status, whatever it was in May, 2003 when he applied for disability, had any bearing on the issue of whether or not he was disabled at that time. The Jordan Hospital emergency room admission for "suicidal ideation, intent and depression" took place in August, 1990, almost thirteen years before he applied for disability. In the years following the admission, he had worked at various jobs with no indication that there were any mental problems which interfered with his ability to work. Although he seemed "anxious and nervous" when Dr. Greeley examined him in June, 2003, there is nothing to indicate that this appearance in any way contributed to a disability.

Lastly, at the hearing, the ALJ first questioned the claimant extensively respecting his prior employment and the reasons why working was difficult for him. All of the claimant's answers revolved around his back conditions; there was not the slightest hint that any mental problems had any effect on his ability to work at the jobs he described. (TR at 217–226) The ALJ then asked him about all of the conditions which the claimant felt rendered him disabled. (TR at 226–243) The claimant answered that "back pain" was "the main thing." The ALJ then asked "what other problems?" and the claimant answered "kidney stones." When the ALJ asked "what else?", the claimant answered "hernias." Then the ALJ asked "what other problems?" The claimant answered "stomach problems." The ALJ then said: "All right. Let's keep going. What else do you have?" The claimant answered "a crescent bone graft" on his hip. After an extensive discussion of what the effect of these conditions are on his ability to work, the ALJ asked "Anything we haven't covered? Anything you came in intending to say that we haven't talked about?" The claimant mentioned Harrington rods in his back and the effect those have on his ability to lean back in a chair. Finally, the ALJ asked "Anything else you wanted to say?" and the claimant did not respond or responded negatively.[5]

After the vocational expert testified, the claimant was further examined by the ALJ and when the claimant mentioned that his back pain kept him from sleeping at night, the ALJ asked "So do we need to add this into this that because of lack of sleep, somehow that affects your ability to do work-type activities during the day?" and

---

5. It is to be noted that the Fifth Circuit has held that by doing this type of a comprehensive inquiry, the ALJ "at least minimally fulfilled his duties ... to develop the relevant facts so that he could fully and fairly decide the case." *James v. Bowen,* 793 F.2d 702, 705 (5 Cir., 1986). *See also Carrier v. Sullivan,* 944 F.2d 243, 245 (5 Cir., 1991) citing *James.*

the claimant said "No, that just reflects my pain." (TR at 249)

Surely with this type of examination, if Mickevich was suffering from a mental condition or his mental health formed any basis of the claim for disability, he would have mentioned it. Although it can be readily acknowledged that unrepresented claimants are at a disadvantage, it begs credulity to think that Mickevich would have failed to mention his mental status if he was suffering from a mental condition at the time especially if it effected his ability to work.

On the basis of the whole record, the Court is left with the firm belief that the ALJ's failure to inquire about the Jordan Hospital admission in 1990 or procure the records of the Cape Cod Hospital admission immediately thereafter or to inquire of the claimant as to his mental health did not result in any prejudice to the claimant. Absent prejudice, there is no reason for a remand. *Brock v. Chater,* 84 F.3d 726, 728 (5 Cir., 1996) citing *Kane v. Heckler,* 731 F.2d 1216, 1219–20 (5 Cir., 1984).

### VII. Order

For the reasons stated, it is ORDERED that the Motion To Reverse Or Remand The Decision Of The Commissioner Of Social Security (# 9) be, and the same hereby is, DENIED. It is FURTHER ORDERED that Defendant's Motion For Order Affirming The Decision Of The Commissioner (# 13) be, and the same hereby is, ALLOWED. Judgment shall enter accordingly.